**McDERMOTT WILL & EMERY LLP**
DANIEL R. FOSTER (CA #179753)
dfoster@mwe.com
JIAXIAO ZHANG (CA #317927)
jiazhang@mwe.com
4 Park Plaza, Suite 1700
Irvine, CA 92614-2559
Telephone: +1 (949) 851-0633
Facsimile: +1 (949) 851-9348

**McDERMOTT WILL & EMERY LLP**
MARGARET H. WARNER (DC #359009)
(*pro hac vice* application pending)
mwarner@mwe.com
500 North Capitol Street, NW
Washington, DC 20001-1531
Telephone: +1 (202) 756-8000
Facsimile: +1 (202) 756-8087

*Attorneys for Plaintiff*
SURFRIDER FOUNDATION

**SURFRIDER FOUNDATION**
ANGELA T. HOWE (CA #239224)
ahowe@surfrider.org
P.O. Box 6010
San Clemente, CA 92674-6010
Telephone: +1 (949) 492-8170
Facsimile: +1 (949) 492-8142

*Attorney for Plaintiff*
SURFRIDER FOUNDATION

McDermott Will & Emery LLP
Attorneys At Law
Irvine

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SURFRIDER FOUNDATION, a California non-profit corporation,<br><br>Plaintiff,<br>v.<br><br>THE INTERNATIONAL BOUNDARY AND WATER COMMISSION – UNITED STATES SECTION, an agency of the United States,<br>Defendant. | CASE NO. **'18 CV1621 WQH BGS**<br><br>**COMPLAINT FOR:**<br>**1) VIOLATIONS OF NATIONAL POLLUTION DISCHARGE ELIMINATION SYSTEM PERMIT NO. CA0108928; AND**<br>**2) VIOLATIONS OF THE FEDERAL WATER POLLUTION CONTROL ACT, 33 U.S.C. §1251 ET SEQ.**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Surfrider Foundation, a California non-profit corporation, by and

through the Surfrider Foundation San Diego County Chapter, hereby files its

Complaint and alleges as follows:

COMPLAINT,
JURY TRIAL DEMAND                           1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

McDermott Will & Emery LLP
Attorneys At Law
Irvine

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .................................................................. 1

II. JURISDICTION AND VENUE ............................................. 7

III. NOTICE ............................................................................... 8

    A. Pursuant to Clean Water Act ("CWA") §§ 505(a)(1) and 505(b)(1), 33 U.S.C. §§ 1365(a)(1), and 1365(b)(1)(A), Surfrider Provided Notice of Intent to Sue On May 15, 2018 ............ 8

    B. As Sixty Days Have Passed Since Giving Notice, Surfrider is Eligible to File Suit ................................................................. 8

    C. No Interim Corrective Actions or Regulatory Actions Have Occurred, and Surfrider is Not Precluded from Filing Suit ................ 8

IV. PARTIES ............................................................................. 9

    A. Plaintiff, Surfrider Foundation ("Surfrider") ........................... 9

    B. Defendant, The International Boundary and Water Commission – United States Section ("USIBWC") ................................. 13

    C. Surfrider Has Standing to Sue under Both the Clean Water Act Citizen Suit Provisions and By Meeting Traditional Concepts of Standing .................................................................. 14

V. STATUTORY AND REGULATORY BACKGROUND ........... 15

    A. The Clean Water Act ("CWA") Provides for Citizen Suits under 33 U.S.C. §§ 1365(a)(1), 1365(g). ......................................... 15

    B. CWA Citizen Suits Provide Judicial Relief to Redress Violations of NPDES Permits and the CWA ............................ 16

    C. The CWA Prohibits Point Source Discharge of Pollutants to Waters of the United States ................................................. 17

    D. The California Porter-Cologne Water Quality Control Act ("Porter-Cologne Act") also Prohibits Point Source Discharge of Pollutants to Waters of the United States ................................. 19

VI. STATEMENT OF FACTS ................................................... 20

    A. Defendant is Responsible for the Management, Control, and Discharge of Storm and Flood Waters in the Tijuana River Valley ....................................................................... 20

        i. Geography ................................................................. 21

        ii. Canyon Collectors ...................................................... 22

        iii. The Flood Control Structure ......................................... 24

COMPLAINT,
JURY TRIAL DEMAND      - i -

**TABLE OF CONTENTS**
(continued)

Page

B. Defendant's Treatment Plant, Outfall, and Collection System are Regulated under NPDES Permit No. CA0108928 .................................. 27

C. Defendant Discharges Pollutants from Its Canyon Collectors in Violation of Its NPDES Permit and the CWA .................................... 28

D. Defendant Discharges Pollutants from Its Flood Control Structure in Violation of the CWA ..................................................... 30

E. Defendant Has Failed to Implement a Spill Prevention and Response Plan, in Violation of Its Permit Requirements for Proper Maintenance and Appropriate Responses to Discharge Violations ........................................................................................ 32

F. Defendant Has Failed to Comply with Monitoring Requirements of Its NPDES Permit ........................................................................ 34

G. By Discharging Waste Into the Waters of the United States, Defendant's Facilities Pollute, Contaminate, and Cause Nuisance, in Violation of Its NPDES Permit .................................... 36

H. Defendant's Goat Canyon Pump Station Failures Violate Its NPDES Permit ...................................................................................... 43

I. Defendant's Receiving Water Limit Exceedances Violate Its NPDES Permit ...................................................................................... 45

J. Even Limited Sampling of Defendant's Significant Effluents Demonstrate Health and Safety Violations of Defendant's NPDES Permit ...................................................................................... 48

VII. CAUSES OF ACTION ................................................................................ 56

A. First Cause of Action: Discharges in Violation of NPDES Permit No. CA0108928, in Violation of the Clean Water Act 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f) .................................. 56

B. Second Cause of Action: Discharges Without a NPDES Permit, in Violation of the Clean Water Act, 33 U.S.C. § 1311(a) ................ 58

VIII. PRAYER FOR RELIEF .............................................................................. 60

IX. JURY DEMAND ......................................................................................... 61

McDermott Will & Emery LLP
Attorneys At Law
Irvine

COMPLAINT,
JURY TRIAL DEMAND

I.      **INTRODUCTION**

1.      Plaintiff Surfrider Foundation brings this civil action to stop the International Boundary and Water Commission–United States Section's ("USIBWC") unlawful Clean Water Act ("CWA") violations, including USIBWC's failure to comply with its National Pollution Discharge Elimination System ("NPDES") Permit No. CA0108928 (California Waste Discharge Requirement Order R9-2014-0009 as amended by Orders R9-2014-0094 and R9-2017-0024) ("NPDES Permit"), and the discharge of polluted waters from its Flood Control Structure into Waters of the United States without a NPDES permit as required by the CWA.  This action arises from USIBWC's ongoing failure to meet water quality standards and critical monitoring and reporting requirements, as well as USIBWC's willful disregard of the sewage, chemicals, heavy metals and other pollutants entering the Tijuana River Valley and nearshore waters of the Pacific Ocean.

2.      This action is filed to uphold the objective of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* (commonly known as the CWA), to "restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251 (a).  The significant violations include, but are not limited to, multiple and ongoing discharges of raw and partially treated sewage, chemicals and other pollutants into a body of water that serves as a major source for recreation, habitat for aquatic life and other wildlife, and as a generator for the coastal economy in south San Diego County.  USIBWC has repeatedly evaded responsibility for violating the CWA.  This action seeks to hold USIBWC responsible for injuries it has caused to the Tijuana River, Tijuana River Valley,

COMPLAINT,
JURY TRIAL DEMAND                  - 1 -

McDermott Will & Emery LLP
Attorneys At Law
Irvine

1   Pacific Ocean, and to the residents and visitors who rely on and enjoy the

2   watershed.

3       3.      This is a citizen suit authorized by Section 505 of the Clean Water Act,

4   33 U.S.C. § 1365, to protect waters of the United States.  Plaintiffs are informed

5   and believe, and on that basis allege, that pollution levels in the Tijuana River

6   Valley and flowing to the Pacific Ocean are in violation of CWA standards for

7   jurisdictional waters and the NPDES Permit issued to USIBWC pursuant to Section

8   402 of the Clean Water Act 33 U.S.C. § 1342.  As a result, USIBWC has violated

9   the terms and conditions of its NPDES Permit, and through the unpermitted

10  discharge of pollutants through its flood control infrastructure, has violated the

11  Clean Water Act through discharges without a permit. 33 U.S.C. §§ 1311(a),

12  1342(a), 1365(a)(1)(A)(B), and 1365(a)(2).

13      4.      The USIBWC was established by the Treaty of 1944 between the

14  United States and Mexico, which prescribed the agency's responsibility for

15  addressing the transboundary sanitation problem.  Subsequently, the United States

16  and Mexican governments approved Minutes 283 and 320 in 1990 and 2015,

17  respectively.  These Minutes were created specifically to further improve sanitation

18  efforts in the Tijuana River Valley.  Despite USIBWC being a signatory to these

19  formal agreements, since at least 2015 there has been no meaningful action or

20  commitment by USIBWC to address any of these issues.

21      5.      The pollution impacting the Tijuana River Valley is within the direct

22  purview of USIBWC under the Treaty of 1944, and USIBWC is statutorily

23  obligated to address that pollution under the Clean Water Act. The Tijuana River

24  Estuary at the mouth of the Tijuana River Watershed is the largest functioning

COMPLAINT,
JURY TRIAL DEMAND                    - 2 -

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

wetland in Southern California, providing habitat for at least six endangered species and many threatened species of wildlife and vegetation. It is an exceptionally rich and invaluable natural resource.

6.    In June 2014, the San Diego Regional Water Quality Control Board ("San Diego Water Board") approved the waste discharge requirements and NPDES Permit for the USIBWC's discharges from its "Facilities," defined as the South Bay International Wastewater Treatment Plant, five canyon collectors, two pump stations, the South Bay Land Outfall ("SBLO"), South Bay Ocean Outfall ("SBOO"), and other associated infrastructure. NPDES Permit at 3. The NPDES Permit prohibits:

> the discharge of waste from the Facilities to a location other than Discharge Point No. 001 [South Bay Ocean Outfall], unless specifically regulated by this Order or separate [waste discharge requirements].

NPDES Permit at 4, Section III.A.

7.    While the NPDES Permit requires USIBWC to prevent discharges from the canyon collectors into receiving waters, including the Pacific Ocean, there have been numerous discharges due to wastewater or other flow events in the Tijuana River Valley since June 2014.

8.    Despite the NPDES Permit requirement to implement a Spill and Transboundary Wastewater Flow Prevention and Response Plan ("Spill Prevention and Response Plan"), including a mitigation plan, the USIBWC's reports for discharge events are conspicuously lacking information on USIBWC containment or cleanup measures required by the NPDES Permit.

9.    Defendant USIBWC's actions and omissions in the Tijuana River Valley have caused detrimental effects on, and pose an ongoing threat to, the water

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

quality and health of the nearshore coastal waters and ecosystem. The Tijuana Sloughs and Imperial Beach areas are particularly affected. For example, in 2017, these areas alone experienced 167 days of park closure and 64 days of beach closure for water quality reasons. These beach closures are due to the steady discharge of pollutants by USIBWC into waters of California and the greater United States, which adversely impact residents, businesses, recreational activities, public safety, and natural habitats.

10. In one example of a pollution event, in February 2017, the Tijuana River Valley experienced a massive spill of between 143,000,000 to 240,000,000 gallons of raw sewage and related stench from USIBWC's Flood Control Structure, which was not prevented, inadequately responded to, and unmitigated. The dangerous pollution in the Tijuana River Valley flows to the public beaches in South San Diego County and results in water contamination and beach closures near Imperial Beach Pier. Families, including those with young children, visit this popular beach.



11.     The coastal area is used also for Junior Lifeguard classes, such as the one pictured below on June 13, 2018.  Due to high bacteria levels, sessions of this 5-week program have been forced to cancel or move for days at a time—with little notice.  Results of water quality samples that were taken at Imperial Beach the day prior, on June 12, 2018, came back the afternoon of when the photograph was taken.  Due to high bacteria levels, a white warning sign was posted within an hour, but the kids in the program had already been exposed. The Junior Lifeguard class was not able to reconvene until June 15, 2018.  This type of occurrence is common





COMPLAINT,
JURY TRIAL DEMAND
- 5 -

1   in that area.

2      12.   Similarly, the otherwise scenic beach and park at Border Field State

3   Park near the Mexico-U.S. border, sits unused and empty because of sewage issues

4   that make it unsuitable for human recreation.  On a recent border sewage tour,

5   Surfrider Foundation members observed a number of posted "KEEP OUT"

6   "SEWAGE CONTAMINATED WATER," "EXPOSURE MAY CAUSE

7   ILLNESS" signs in English and Spanish posted to warn the public that swimming,

8

9   biking, or hiking in this area is hazardous.





13.   At its core, this case is about the dereliction of duty and wanton

disregard for public health at the hands of a federal public agency.  By making bare

minimum improvements and blaming any lag in progress on Mexico's inaction,

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

USIBWC has disregarded not only its agency mandate but also the established requirements of U.S. federal law to protect the nation's waters.

14.     The USIBWC must be ordered to protect public health and safety by adhering to water quality standards, rather than flagrantly flouting its duties under the Clean Water Act to provide for protections of the waters of the United States. Accordingly, judicial relief, as requested herein, is necessary to enforce the protections of the Clean Water Act for waters of the United States.

## II.     JURISDICTION AND VENUE

15.     This civil action involves conduct, injuries, and rights to relief that present federal questions arising under the CWA, 33 U.S.C. § 1251 *et seq*. Accordingly, this court has jurisdiction over the subject matter of this action pursuant to 33 U.S.C. §1365(a)(1) and (b)(1).

16.     Venue is proper in the Southern District of California pursuant to 28 U.S.C. § 1391(b)(2) and 33 U.S.C. § 1365(c)(1) because the acts and omissions giving rise to this claim—the water pollutant discharge sources of the effluent standard and limitation violations described herein—all occurred and/or are located in San Diego County, California, in the Southern District of California.

17.     The United States District Court for the Southern District of California has jurisdiction to, *inter alia*, order any civil penalties  and grant equitable relief, including, but not limited to, an order to comply with the CWA and applicable permits thereunder, 33 U.S.C. §§ 1319(d), 1319(g) and 1365(a).

McDermott Will & Emery LLP
Attorneys At Law
Irvine

III.  **NOTICE**

A.  **Pursuant to Clean Water Act ("CWA") §§ 505(a)(1) and 505(b)(1), 33 U.S.C. §§ 1365(a)(1), and 1365(b)(1)(A), Surfrider Provided Notice of Intent to Sue On May 15, 2018**

18.   Surfrider provided a Notice of Intent to Sue ("NOI," attached as Exhibit 1) on May 15, 2018 to all applicable parties.  Via certified mail, proper notice was sent to the violator, the International Boundary and Water Commission–United States Section; the state regulatory agency, the California State Water Resources Control Board; and then- United States Environmental Protection Agency (EPA) Administrator, Scott Pruitt.  Notice also was sent via certified mail to the then-Acting Regional Administrator for EPA's Region 9 Office, Alexis Strauss; and United States Attorney General, Jeff Sessions.

B.  **As Sixty Days Have Passed Since Giving Notice, Surfrider is Eligible to File Suit**

19.   Following Fed. R. Civ. Proc. Rule 6 for computing time, sixty days have passed from the date of providing proper Notice to the aforementioned parties. Thus, Surfrider exercises its legal right to file a citizen suit against the violator, the International Boundary and Water Commission–United States Section.

C.  **No Interim Corrective Actions or Regulatory Actions Have Occurred, and Surfrider is Not Precluded from Filing Suit**

20.   This citizen suit is not barred by mootness because the violator has not taken the necessary steps to come into compliance with the Clean Water Act and

COMPLAINT,
JURY TRIAL DEMAND

- 8 -

McDermott Will & Emery LLP
ATTORNEYS AT LAW
IRVINE

the applicable NPDES permit.

21.     This citizen suit is not barred by the applicable regulatory agency requiring Clean Water Act compliance for effluent standards or limitations or with an Order requiring compliance, as no such requirements have been issued.

22.     This citizen suit is not barred by the applicable regulatory agency commencing or continuing a civil or criminal action against the violator, as no such complaint has been filed as of this time—the date and time of this complaint's filing.

## IV.     PARTIES

### A.     Plaintiff, Surfrider Foundation ("Surfrider")

23.     Plaintiff Surfrider is a non-profit corporation with its principal office in San Clemente, California.  Surfrider is a grassroots environmental organization with more than 250,000 supporters and members, 80 local chapters, and over 80 school clubs in the United States.  Surfrider's mission is the protection and enjoyment of the world's ocean, waves, and beaches.  Through its powerful activist network, Surfrider advocates for clean water, ocean protection, coastal preservation, public beach access, and the prevention of marine plastic pollution.  The vision of Surfrider's Clean Water Initiative is to ensure that water is clean for surfing, swimming and other coastal recreation.  Surfrider seeks to protect water resources and prevent pollution along coasts and waterways by engaging communities, testing water, and advocating for holistic clean-water solutions.

McDermott Will & Emery LLP
Attorneys At Law
Irvine

24.     Surfrider's San Diego County Chapter is particularly affected by the inaction of the USIBWC because its members live, work, and recreate along the Southern California coast.  San Diego County alone has 1,680 Surfrider members that are negatively affected by the USIBWC violations.  Those members that reside in Imperial Beach and Coronado are particularly affected by beach closures due to transboundary contamination. These members are dismayed that they and their families are unable to recreate on the beaches just blocks away from their homes. Instead, they must travel farther north to beaches that remain unaffected by the border contamination and do not pose health risks.  Further, Surfrider members that



own businesses in Imperial Beach face additional negative economic impacts because closed beaches inhibit the success of businesses that need open beaches to draw tourism and other revenue into the community.



25. Over the last decade, Surfrider has been active in advocating for clean water in the Tijuana River Valley. In 2010, Surfrider played an integral role in the formation of the Tijuana River Action Network ("Action Network"). The Action Network is a collaborative effort to conserve and restore the Tijuana River Watershed by engaging in outreach, education, and advocacy for natural resources. In 2015, Surfrider was also active in the Minute 320 working group that set up realistic implementation measures for the USIBWC to accomplish for the health and safety of the Tijuana River Watershed. Since 2010, the Action Network and its members have observed Tijuana River Action Month ("TRAM") in the area, hosting activities, including cleanup events, to raise awareness and improve conditions. Unfortunately, due to increasing health and safety concerns, to Surfrider's knowledge, no group has undertaken cleanup efforts in the Tijuana

McDermott Will & Emery LLP
Attorneys At Law
Irvine

River Valley since September 2017.

26.    Surfrider is also represented in the USIBWC Citizens Forum ("Citizens Forum"), which facilitates the exchange of information between the USIBWC and members of the public about Commission activities in San Diego County, California.  To date, the flow of information has not led to tangible solutions to the contamination problem despite frequent pleas by the public. At *every* Citizens Forum meeting, emotional and angry members of the public voice their opinions on this critical issue. Despite community members' evident outrage at the continued issues and inaction, USIBWC has consistently responded that it is unable to fix the problem.  The USIBWC's lack of foresight and planning is evident, when the primary facility, the SBIWTP, is at capacity, and all indicators point to the sewage problems only getting worse over time.

27.    Additionally, Surfrider is an active participant in the Tijuana River Valley Recovery Team. Formed by the San Diego Water Board, the Recovery Team is a collaboration of more than 30 government agencies, property owners, academic and research institutions, and NGOs that work together to present tangible solutions to the problems in the Tijuana River Valley.

28.    Surfrider's San Diego County Chapter ("Chapter") also created the "No Border Sewage" or "No B.S." campaign that is designed to address the environmental issues affecting the wetland areas and beaches of the border region. This campaign focuses on raising awareness of, outreach, and education on this overwhelming public health and safety problem.  The Chapter also formed a network of NGOs and agencies on both sides of the border to build collaborative efforts to address the conservation and restoration of the Tijuana River Watershed.

McDermott Will & Emery LLP
Attorneys At Law
Irvine

29.     These extensive efforts by Surfrider and Surfrider partners are thwarted by the inaction of USIBWC, and without further action by the courts, USIBWC will continue an ineffective agency allowing for the exacerbation of dangerous the dangerous problem of border pollution.

30.     Surfrider members are suffering from these concrete and particularized injuries as a result of USIBWC's inaction, and until USIBWC obtains and is in compliance with the necessary NPDES permits and the Clean Water Act, those injuries will continue indefinitely.  The interests that Surfrider seeks to protect through this lawsuit are fundamental to Surfrider' organizational purpose.

## B.     Defendant, The International Boundary and Water Commission – United States Section ("USIBWC")

31.     USIBWC is an agency and instrumentality of the United States government. USIBWC is the agency charged with addressing transboundary water issues arising out of agreements between the United States and Mexico, including, but not limited to, the Treaty of 1944.

32.     The Treaty of 1944 obligates USIBWC to "give preferential attention to the solution of all border sanitation problems," including the Tijuana River Watershed. USIBWC defines a "border sanitation problem" to include

> each case in which waters that cross the boundary, including coastal waters . . . have sanitary conditions that present a hazard to the health and well-being [to] inhabitants [on] either side of the border or impair the beneficial uses of [those] waters.

Minute 261, Recommendations for the Solution to the Border Sanitation Problems, (Sept. 24, 1979).

33.     To carry out these treaty obligations, USIBWC has constructed,

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

operated and/or contracted to operate, and maintained flood control and wastewater collection, conveyance, and treatment infrastructure in the Tijuana River Valley.[1]

34.     The facilities used by both Mexico and the United States in the fulfillment of the provisions of the Treaty remain under the exclusive jurisdiction and control of the country where the facilities are located. However, the USIBWC and its personnel are authorized to carry out their observations, studies, and field work in the territory of the other.

## C.     Surfrider Has Standing to Sue under Both the Clean Water Act Citizen Suit Provisions and By Meeting Traditional Concepts of Standing

35.     Section 505 of the Clean Water Act (CWA) provides all citizens the opportunity to sue Act violators, such as the USIBWC, and effectively enforce the Clean Water Act via a civil citizen suit. 33 U.S.C. § 1365(g).

36.     Surfrider satisfies standing under Article III of the United States Constitution. Article III standing requires that the party seeking to sue must personally have suffered some actual or threatened injury that can fairly be traced to the challenged action of defendant, and that the injury is likely to be redressed by a favorable decision.

37.     Surfrider also satisfies the requirements for organizational standing. Surfrider members have suffered and continue to suffer from economic loss, health

---

[1] Although USIBWC may contract out their day-to-day operations in the Tijuana River Watershed to an independent third party contractor, USIBWC is still responsible for all operations and controls all of the facilities. Thus, any unlawful discharges from the USIBWC facilities covered by NPDES Permit No. CA0108928 are and remain the responsibility of USIBWC.

COMPLAINT,
JURY TRIAL DEMAND                    - 14 -

risks, and altered behavior in response to the ongoing Tijuana River contamination. Surfrider members and their families have a geographical nexus with the affected environment. They live, work, own property, run businesses and recreate in the affected areas of San Diego County.

38.     If USIBWC were to capture the contamination in accordance with the CWA and its existing NPDES Permit, the toxic pollutants currently found in the Tijuana River Watershed would be substantially decreased. Beaches would not be closed for more than a third of the year due to significant health risks to the public. Business owners would not need "sewer day fund[s]" to survive the economic impacts of beach closures due to sewer contamination. Gustavo Solis, *How do you run a surf shop when sewage spills constantly close the beach?* (May 27, 2018, 6:00AM) http://www.sandiegouniontribune.com/communities/south-county/sd-se-imperial-beach-sewage-surf-20180515-story.html.

39.     The injuries are actual, concrete injuries that would be redressed by the relief sought herein.  Surfrider brings this complaint on behalf of themselves, their members and their families.

## V.     STATUTORY AND REGULATORY BACKGROUND

### A.     The Clean Water Act ("CWA") Provides for Citizen Suits under 33 U.S.C. §§ 1365(a)(1), 1365(g).

40.     Surfrider is a "person" pursuant to Section 502 of the CWA, 33 U.S.C. § 1362(5), which defines a "person" as "an individual, corporation, partnership, association, State . . . or any interstate body."

41.     Surfrider and its members are "citizens" pursuant to Section 505 of the CWA, 33 U.S.C. §§ 1365(a) and 1365(g), because they are "persons having an

COMPLAINT,
JURY TRIAL DEMAND                                    - 15 -

interest which is…adversely affected" by USIBWC's illegal discharges.

42.    USIBWC may be sued pursuant to Section 505 of the CWA, 33 U.S.C. § 1365(a), which authorizes any citizen to "commence a civil action . . . against any person . . . who is alleged to be in violation of an effluent standard or limitation…or an order issued by the Administrator or a State with respect to such a standard or limitation." "[T]he term 'effluent standard or limitation'" includes "a permit or condition thereof issued under section 1342 of this title." 33 U.S.C. § 1365(f).

### B.    CWA Citizen Suits Provide Judicial Relief to Redress Violations of NPDES Permits and the CWA

43.    Section 505 of the CWA authorizes the district courts "to enforce such an effluent standard or limitation . . . and to apply any appropriate civil penalties under section 1319(d)."

44.    Section 309 of the CWA (33 U.S.C. § 1319(d)) provides that "any person" who violates Section 301 of the CWA (33 U.S.C. § 1311) or violates any NPDES permit condition, "shall be subject to a civil penalty" (33 U.S.C. § 1342).

45.    Pursuant to the EPA's Interim Clean Water Act Settlement Penalty Policy, each exceedance of a daily effluent limitation shall be treated as a distinct violation, and each exceedance of a monthly average limit shall be treated as a violation for every day in the month in which the violation occurred. *Interim Clean Water Act Settlement Penalty Policy*, Environmental Protection Agency, (March 1, 1995), https://www.epa.gov/enforcement/interim-clean-water-act-settlement-penalty-policy.

46.    Per the Federal Civil Penalties Inflation Adjustment Act, as amended by the Debt Collection Improvement Act, each separate violation of the CWA

COMPLAINT,
JURY TRIAL DEMAND                    - 16 -

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

subjects the violator to a penalty of up to $53,484 per day for all violations that occurred after November 2, 2015, pursuant to Sections 309(d) and 505(a) of the CWA, 33 U.S.C. §§ 1319(d), 1365(a), and 40 C.F.R. §§ 19.1–19.4, Table 2.

47.    Under the citizen suit provision of the CWA, the court may also award "costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party." 33 U.S.C. § 1365(d).

### C.    The CWA Prohibits Point Source Discharge of Pollutants to Waters of the United States

48.    The CWA protects United States water resources through regulation of discharges to "navigable waters," which the statute defines as "the waters of the United States, including the territorial seas." 33 U.S.C. §§ 1362(7), 1319(a)(3), 1319(b).

49.    Section 301 of the CWA, 33 U.S.C. § 1311(a), prohibits the "discharge of any pollutant by any person" into navigable waters except in compliance with a NPDES permit issued by the Environmental Protection Agency (EPA) or an authorized state administrator pursuant to Section 402 of the CWA, 33 U.S.C. § 1342. Authorized administrators are able to "prescribe conditions for [NPDES] permits to assure compliance . . . including conditions on data and information collection, reporting, and such other requirements as he deems appropriate."

50.    Section 502 of the CWA, defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

51.    Section 502 of the CWA defines "pollutant" as:
dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water.

33 U.S.C. § 1362(6).

52. Section 502 of the CWA defines "point source" as:
any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged.

33 U.S.C. § 1362(14).

53. 40 C.F.R. 230.3(o)(1) defines "waters of the United States" as "[a]ll waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide, [etc.]."

54. NPDES permits establish "effluent limitations," which are defined as "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters." 33 U.S.C. § 1362(11).

55. Section 308 of the CWA, 33 U.S.C. § 1318, requires NPDES permittees to establish and maintain records; to install, use and maintain monitoring equipment; to sample effluents; and to "make such reports" as required in the permit regarding permittees' pollutant discharges.

56. Section 301(b) of the CWA and implementing EPA permit regulations at 40 C.F.R. 122.44(a)(1) require permits to include conditions for meeting applicable technology-based requirements, and any more stringent effluent limitations necessary to meet applicable water quality standards. Regulations promulgated in 40 C.F.R. 125.3 require that technology-based effluent limitations

COMPLAINT,
JURY TRIAL DEMAND                    - 18 -

be placed in NPDES permits. *See also* NPDES Permit at F-17.

57.     The CWA establishes the minimum performance requirements attainable through the application of secondary treatment. 40 C.F.R. 304(d)(1). Based on this statutory requirement, EPA developed secondary treatment regulations, which are specified in 40 C.F.R. 133 and apply to all wastewater treatment plants. These technology-based regulations identify the minimum level of effluent quality attainable by secondary treatment in terms of Biochemical Oxygen Demand (5-day) ($BOD_5$), Total Suspended Solids (TSS), and pH.

58.     Failure to comply with any condition of a permit is a violation of Section 301 of the CWA, 33 U.S.C. §1311.

> **D.      The California Porter-Cologne Water Quality Control Act ("Porter-Cologne Act") also Prohibits Point Source Discharge of Pollutants to Waters of the United States**

59.     The Porter-Cologne Act is the principal law governing water quality regulation in California. It establishes a comprehensive program to protect State water quality and is applicable to surface waters, wetlands, ground water and to both point and nonpoint sources of pollution. Cal. Water Code §§ 13000 *et seq.*

60.     Under the Porter-Cologne Act, the nine California Regional Water Quality Control Boards are authorized to take individual permitting, inspection, and enforcement actions within their respective regions.

61.     Both statewide and basin (regional) specific water quality control plans have been adopted and are updated as necessary to guide policies for water pollution management in California.

62.     Statewide and regional water quality control plans include enforceable

COMPLAINT,
JURY TRIAL DEMAND                    - 19 -

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

prohibitions against certain types of discharges. The basin plans also contain implementation, surveillance, and monitoring requirements. Portions of water quality control plans, the water quality objectives and beneficial use designations, are subject to review by the EPA—when approved they become water quality standards under the CWA and are integrated into the State NPDES program.

63.     With EPA approval, and under the California Water Code, the State and its relevant regulatory bodies issue and enforce NPDES permits.

## VI.     STATEMENT OF FACTS

### A.     Defendant is Responsible for the Management, Control, and Discharge of Storm and Flood Waters in the Tijuana River Valley

64.     The Treaty of 1944 requires that USIBWC coordinate and work with the Comision de Limites y Aguas ("CILA"), its Mexican counterpart, to ensure the health of the Tijuana River Watershed. Both parties have approved additional Minutes to the Treaty since 1944.

65.     Minute 283 was approved in 1990 and created the Conceptual Plan for the International Solution to the Border Sanitation Problem in San Diego, California and Tijuana, Baja California.  Part of this agreement was a general plan for the construction of a sewage treatment plant designed "to capture and treat Tijuana wastewater, which would otherwise flow into the U.S. through the Tijuana River and canyons, to secondary standards for discharge into the Pacific Ocean."

66.     Minute 320 was approved in 2015 and created a water quality working group to identify solutions to border contamination. Both Surfrider and USIBWC were participants in this process.  The working group has failed to make meaningful

COMPLAINT,
JURY TRIAL DEMAND                          - 20 -

McDermott Will & Emery LLP
ATTORNEYS AT LAW
IRVINE

progress. This is primarily due to USIBWC's continued failure to take action or make a commitment to any of these pressing issues—despite signing the agreement.

67.     The facilities at issue in the Tijuana River Valley are owned and operated by USIBWC.  USIBWC is the named permittee under the CWA for the facilities at issue in this case.

68.     The South Bay International Wastewater Treatment Plant ("SBIWTP") is permitted to treat up to 25 million gallons per day ("MGD") of untreated raw sewage from Mexico and provides secondary treatment before discharging it via the South Bay Ocean Outfall ("SBOO") in to the Pacific Ocean.

69.     The USIBWC has acquired and installed flow meters in the Tijuana River. The currently operating flow meters are located: 1) located immediately upstream of the CILA Pumping Station ("PB-CILA") before the international border; 2) downstream from the intake) from the intake of PB-CILA; and 3) downstream of the United States border. These help quantify the amount of wastewater in the system and the amount of wastewater flowing into the Flood Control Structure in the event of a PB-CILA bypass. *See* Wastewater Flow Schematic, NPDES Permit at C-1.

### i.  Geography

70.     The Tijuana River watershed covers over 1,000,000 acres of land along the most western end of the U.S. and Mexican border ("Border")—73% of which is located within Mexico.  The majority (about 114 miles) of the Tijuana River is also located within Mexico, not crossing into the U.S. until about six miles from its mouth at the Pacific Ocean. This area between the Border and the Pacific Ocean through which the Tijuana River has flowed is known as the Tijuana River

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

Valley ("Valley"). Upon crossing into the U.S., the Tijuana River immediately enters USIBWC's Flood Control Structure, which terminates 0.9 miles past the Border. At the termination point, the Flood Control Structure discharges its contents into an otherwise dry area of the Valley. The discharge point has created an unimproved river channel surrounded by open fields, farms, and riparian forest before running into the Pacific Ocean at Imperial Beach.

71.     Over the past couple hundred years, development and other land uses have caused dramatic physical and ecological changes in the Valley.  Changes including loss of habitat, increased sedimentation, habitat conversion, fewer floods, and an increase in the number of plants and organisms "non-native" to the Valley, some of which are invasive.  A large part of this is due to the concrete Flood Control Structure—a uniform 330 foot-wide concrete channel that carries flows to an area of the Valley through which the river channel does not naturally run.  As a result of the channelization, the natural alluvial streambed and riparian vegetation, as well as attendant physical and ecological processes have all been decreased significantly, if not eliminated completely.  The Flood Control Structure has severed the historical river corridor and diminished the Valley's ecological value.

72.     As a result of USIBWC's discharges from the Flood Control Structures, the watershed now suffers from several human-induced pollutants, which negatively impact residents, business-owners, and tourists alike.

### ii.  Canyon Collectors

73.     USIBWC operates five "canyon collectors" that include concrete channels and basins designed to catch and divert uncollected sewage and runoff from Mexico in the hills west of the SBIWTP. These canyon collectors are

COMPLAINT,
JURY TRIAL DEMAND
- 22 -

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

1   Smuggler's Gulch, Goat Canyon, Canyon del Sol, Stewart's Drain, and Silva Drain.



74.     The canyon collectors are designed to prevent waste and other water flows from discharging north into the Tijuana River. Each canyon collector entrance abuts the Border and spans the opening of drainage points at which wastewater crosses the Border into the United States.  All wastewater that crosses the Border at these points is necessarily captured into the canyon collectors' conveyance and detention features. Either directly or via a conveyance channel, these facilities collect and direct wastewater into a shallow detention basin. Wastewater in the detention basin is then directed to a screened drain inlet ("collector inlet") regulated by a valve. USIBWC ultimately controls whether the collector inlet is open or closed.  When opened, polluted water detained in the detention basin is accepted into a pipe system and conveyed via pump or gravity to the SBIWTP for treatment, and thereafter for discharge at the South Bay Ocean

McDermott Will & Emery LLP
ATTORNEYS AT LAW
IRVINE

COMPLAINT,
JURY TRIAL DEMAND                    - 23 -

Outfall in compliance with the South Bay Plant NPDES Permit.

75.     When the collectors are properly operated and maintained, pollutants collected therein are diverted to the SBIWTP for treatment and eventually discharged at the South Bay Ocean Outfall. However, when the collectors are closed or not functioning properly, which is frequent, wastewater in the detention basin cannot drain into the conveyance and treatment system, and instead overflows the detention basin and discharges into the Tijuana River Valley in violation of the NPDES Permit.

76.     Design capacity for the collectors is often exceeded.  As a result, the collectors overflow and discharge effluent into the Tijuana River Valley unlawfully. The downstream drainages that receive canyon collector discharges are tributary to the Tijuana River and/or Tijuana River Estuary.

### iii.  The Flood Control Structure

77.     USIBWC operates the Flood Control Structure, a concrete lined channel that alters and constricts the natural course of the Tijuana River.

78.     The concrete structure at the U.S. border redirects water from Mexico westward for 0.9 miles.

79.     USIBWC's Flood Control Structure is flared to help slow down the flow of the river in flood events and is designed to contain a flood of 135,000 cubic feet per second (cfs).

80.     Defendant designed its Flood Control Structure to sever the Tijuana River's historical course and redirect it into a new waterbody, to protect the San Ysidro community and the SBIWTP during flood events.

COMPLAINT,
JURY TRIAL DEMAND                         - 24 -

McDermott Will & Emery LLP
ATTORNEYS AT LAW
IRVINE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



81.    On April 4, 2018, the USIBWC installed a small sand berm (circled in red in the photograph below) in the Flood Control Structure to mitigate uncaptured flows from entering the Flood Control Structure and discharging into Tijuana River Valley.  The berm will wash away when it rains and does not improve

COMPLAINT,
JURY TRIAL DEMAND

effluent quality, but momentarily helps stop small dry weather flows by holding the water at the Border until CESPT (Comisión Estatal de Servicios Públicos de Tijuana, or the State Public Services Commission of Tijuana, the Tijuana, Mexico water authority) is able to pump it back and away.  The small, temporary berm is a stop-gap measure that will become discharge itself when it washes out of the Flood Control Structure. The berm is not a substitute under the CWA for USIBWC obtaining and complying with a NPDES permit for the Flood Control Structure.



82.     The waters below the Flood Control Structure that receive USIBWC's discharges from that structure are tributary to the historical course of the Tijuana River and Estuary.  The waters below the Flood Control Structure that receive USIBWC's discharges from that structure would not exist but for USIBWC's construction and operation of the Flood Control Structure.  No pollutants would be

added to those waters without the Flood Control Structure.

## B. Defendant's Treatment Plant, Outfall, and Collection System are Regulated under NPDES Permit No. CA0108928

83.     The USIBWC NPDES Permit at issue came into effect on August 1, 2014 and was issued by the San Diego Water Board for the SBIWTP and related "Facilities" located in the Tijuana River Valley.  These permitted Facilities are the location of the CWA violations alleged in this complaint.

84.     The Permit prohibits the discharge from the Facilities to any location other than the South Bay Ocean Outfall, except to the extent that such discharges are regulated by another permit or requirement.

85.     Discharges from the Facilities at locations other than the South Bay Ocean Outfall ("SBOO") are unlawful and violate both the CWA and the NPDES Permit. This includes discharges from the canyon collectors and other associated structures.

86.     As the permitted discharger, USIBWC must comply with Discharge Prohibitions laid out in the Water Quality Control Plan for Ocean Waters of California, California Ocean Plan ("Ocean Plan"). NPDES Permit at 4, III. The Ocean Plan identifies beneficial uses of ocean waters of the state to be protected and establishes water quality objectives, general requirements for management of waste discharged to the ocean, effluent quality requirements for waste discharges, discharge prohibitions, and general provisions. The Ocean Plan was adopted by the State Water Board in 1972 and last amended in 2015. The latest amendment to the Ocean Plan was adopted on May 6, 2015, became effective on January 28, 2016,

COMPLAINT,
JURY TRIAL DEMAND                          - 27 -

and is available at

https://www.waterboards.ca.gov/water_issues/programs/ocean/docs/cop2015.pdf.

87.     USIBWC must comply with the Discharge Prohibitions laid out in Chapter 4 of the Water Quality Control Plan for the San Diego Basin ("Basin Plan"). NPDES Permit at 4, III. Discharge Prohibitions.

### C.     Defendant Discharges Pollutants from Its Canyon Collectors in Violation of Its NPDES Permit and the CWA

88.     The NPDES Permit regulates all discharges from the USIBWC Facilities, including the five canyon collectors. The Permit prohibits discharges from any USIBWC Facilities other than the South Bay Ocean Outfall.

89.     The canyon collectors are designed to capture transboundary flows at the precise moment they cross the border from Mexico so they can be treated and discharged via the South Bay Ocean Outfall.

90.     When the canyon collectors are not functioning properly and do not capture the transboundary flows, they are discharged into waters of the United States in violation of the NPDES Permit. In so doing, the canyon collectors transfer waters from Mexico to waters of the United States. The current canyon collector operations are not sufficient to address the border pollution problem as required by the Clean Water Act. The frequent failures result in stench and pollution in the Tijuana River Valley region.

91.     NPDES Permit section VI.C.2.a.1 defines three possible types of "flow event[s]" through the canyon collectors for the purpose of monitoring and reporting requirements. These flow events are "Spill[s] from the Facilities"; "Transboundary Wastewater Flow Past the Canyon Collector System (Flow Type A)"; and

COMPLAINT,
JURY TRIAL DEMAND

- 28 -

"Transboundary Wastewater Flow Event or Other Spill/Wastewater Flow Event in Mexico (Flow Type B)." NPDES Permit at 15, VI.C.2.a.i.

92.   Flow Type A is defined as:
A dry weather transboundary treated or untreated wastewater or other flow through a conveyance structure owned and operated by the United States Government into [the five canyon collectors] and not diverted into the canyon collector system for treatment at the Facility.

NPDES Permit at 15, VI.C.2.a.i.b.

93.   Flow Type B is defined as:
A dry weather spill or dry weather transboundary wastewater or other flow . . . that creates, or threatens to create, pollution or nuisance conditions in waters of the United States and/or State including the Tijuana River (main channel), Yogurt Canyon drainage, other unnamed drainages and nearby coastal marine waters.

NPDES Permit at 15, VI.C.a.i.c.

94.   "Flow" is defined as a type of discharge. It is not excluded from being a discharge in any way. The word flow is used to help describe the type of plan the USIBWC is required to put together. Thus, "spill" and "flow" are two different types of discharges and because of the causal differences between them, spills and flows must be handled differently in the Prevention Plan.

95.   "Wastewater flow" is defined as flow that has been used in some "industrial" process and is a discharge under the CWA.

96.   The collectors are subject to the various "Receiving Water Limitations" in Section V of the NPDES Permit, and any other "Facilities" requirements put forth in the Permit.

97.   "Bypass" is defined as "the intentional diversion of waste streams from any portion of a treatment facility." NPDES Permit at D-2, citing 40 C.F.R. §122.41(m)(1)(i). The NPDES Permit explicitly forbids wastewater bypasses unless

approval is granted by the San Diego Water Board or USIBWC sends notice of the event when completely unavoidable.  The limitations and guidelines for bypasses are set out in NPDES Permit Attachment D.  Flows through the canyon collectors that are not captured, or cannot reasonably be captured, violate this part of the permit.

98.    The frequency and contents of canyon collector discharges violating the NPDES Permit are detailed in section II.A. of the NOI. *See* NOI, Section II.A. The total volume of the Type A spills summarized in Table A of the NOA is at least 14,893,838 gallons. These overflows are ongoing, continuous, and destructive.

99.    The failure to regulate discharges in accordance with the NPDES Permit as described above constitutes a separate Section 402 violation under the CWA.

### D.    Defendant Discharges Pollutants from Its Flood Control Structure in Violation of the CWA

100.    The CWA and NPDES program regulate the discharge of pollutants from point sources into navigable waters. The point source does not have to be the generator of that pollutant for a NPDES permit to be required. *See* 33 U.S.C. § 1362(12), (14).

101.    The Flood Control Structure is a point source within the definition of the CWA, as it conveys water via a concrete structure into waters of the U.S.

102.    USIBWC adds pollutants to waters of the United States downstream of the Flood Control Structure virtually every time wastewater flows out of the Flood Control Structure. Such pollutants primarily include untreated sewage, chemicals, trash, and other toxic waste.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

103.   Waters upstream of the Flood Control Structure are waters located in and subject to the sovereignty of Mexico.

104.   The USIBWC captures in the Flood Control Structure all waters that would have flowed into the historical course of the Tijuana River upon crossing the Border into the U.S. These captured flows include wastewater flows containing sewage and other pollutants.

105.   USIBWC does not collect or treat pollutants it captures in its Flood Control Structure, but instead, discharges from the Structure virtually all of the pollutants it captures therein into downstream waters, which are navigable or  are tributary to a navigable water in the United States..

106.   The waters upstream and downstream of the Flood Control Structure are meaningfully distinct.  There is no natural or historical pathway between the waters upstream of the structure and those downstream, and the waters downstream of the Flood Control Structure would not exist but for USIBWC's construction and operation of the Flood Control Structure.

107.   Historically, the Tijuana River Channel in the vicinity of the Tijuana River Valley originally varied between 200 and 4,600 feet wide. In contrast, the Flood Control Structure is a uniform 330 feet wide. Additionally, the Flood Control Structure has caused the entire Tijuana River Valley and Estuary to change both physically and ecologically. Changes to the natural Tijuana River Valley include: loss of habitat, increased sedimentation, habitat conversion, fewer floods, and an increase in the number of non-native species, plants, and organisms. Due to the implementation of the Flood Control Structure, the natural alluvial streambed and riparian vegetation, as well as attendant physical and ecological processes have all

COMPLAINT,
JURY TRIAL DEMAND                              - 31 -

decreased significantly, if not been eliminated completely.

108.   Each discharge without a NPDES permit as described above constitutes a separate violation of Section 402 of the CWA.

**E.    Defendant Has Failed to Implement a Spill Prevention and Response Plan, in Violation of Its Permit Requirements for Proper Maintenance and Appropriate Responses to Discharge Violations**

109.   Under section VI.C.2.a of the NPDES Permit, USIBWC must comply with Special Studies, Technical Reports and Additional Monitoring Requirements when developing and complying with the Spill Prevention and Response Plan ("Plan"). NPDES Permit at 15-22.

110.   Flow Type A events are regulated under this section.

111.   In accordance with section VI.C.2.a.iii of the NPDES Permit, the USIBWC submitted a draft of the Plan on December 22, 2014 to the San Diego Water Board. A revised Spill Prevention and Response Plan was submitted by the USIBWC on July 13, 2015, following a public notice and comment period.

112.   Upon submission of this revised plan, the USIBWC was required to immediately implement the Spill Prevention and Response Plan in order to comply with section VI.C.2.a.iii, of the NPDES Permit. The required immediate implementation did not happen.

113.   The Spill Prevention and Response Plan ("Plan") is attached as Exhibit 3 and also available online, at

https://www.ibwc.gov/Files/SBIWTP_Spill_Plan_2015_English.pdf.

114.   Under the Plan, USIBWC is a responsible party for Flow Type A

COMPLAINT,
JURY TRIAL DEMAND

- 32 -

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

occurrences. Plan at 10.

115.   After each Flow Type A, the USIBWC "must develop an appropriate cleanup strategy [that] include[s] the personnel assignments, equipment needed to complete the cleanup, [and] appropriate disposal of collected material (wastewater, trash, debris, sand, etc.)." Spill Prevention and Response Plan at 10.

116.   This Plan outlines specific actions that are required in the cleanup of Flow Type A occurrences. These include, but are not limited to:

a. Collection of the solid and liquid material and other debris;
b. Vacuum truck recovery of wastewater or polluted water and wash down water; [and]
c. Cleanup of the impacted storm drains in accordance with NPDES storm water permit.

Spill Prevention and Response Plan at 22.

117.   Under the NPDES Permit (section VI.C.2.a.ii) and the Spill Prevention and Response Plan (at 23), USIBWC is required to notify, among others, the San Diego Water Board of the Flow Type A events and the corrective measures taken using the Facility Spill/Transboundary Flow Event Form. *See* Exhibit 3, Spill Prevention and Response Plan, Appendix G(i).

118.   A review of the data submitted to the San Diego Water Board under the Spill Prevention and Response Plan, is shown in Table A of the NOI, attached as Exhibit 1, and also available at:

https://www.waterboards.ca.gov/sandiego/water_issues/programs/tijuana_river_valley_strategy/spill_report.html.

119.   The data contained in Table A of the NOI shows that the USIBWC continually and consistently self-reports "0" or "none" as the volume of spill recovered; "none" for "spill response actions," and "none" for "spill corrective

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

1  actions."

2  120.  It is not enough that the USIBWC drafted, submitted, and published its

3  Spill Prevention and Response Plan. USIBWC must actually comply with its Plan

4  in order to fulfill its NPDES permit obligations under its NPDES Permit. This lack

5  of action by USIBWC demonstrates a clear failure to implement the Spill

6  Prevention and Response Plan, which is a violation of the NPDES Permit.

### F.  Defendant Has Failed to Comply with Monitoring Requirements of Its NPDES Permit

121.  Attachment E, "Monitoring and Reporting Program," requires the

USIBWC to monitor Flow Type A occurrences. NPDES Permit at E-32,

Attachment E, VII.B.1.

122.  Attachment E lays out several specific questions that Flow Type A

monitoring is supposed to answer. These include: what pollutants are present in the

flows and their concentration, whether pollutants in Flow Type A occurrences

affect beneficial uses of the Tijuana River and Estuary, and the mass loading of

pollutants on the Tijuana River and Estuary over time. NPDES Permit at E-32,

Attachment E, VII.B.

123.  Flow Type A occurrences also are required to measure a number of

other items listed in Table E-10 of the Monitoring and Report Program. These items

are: BOD (Biochemical Oxygen Demand), TSS, TDS (Total Dissolved Solids),

Turbidity, pH, Total Nitrogen, Total Phosphorus, Enterococcus, Fecal Coliform,

Total Coliform, Dissolved Oxygen, Pesticides, Surfactants (MBAS), Priority

Pollutants, and Chronic Toxicity. These measurements are required to be taken

once per Type A occurrence.  NPDES Permit at E-33, Attachment E, VII.B.3.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

COMPLAINT,
JURY TRIAL DEMAND

- 34 -

Enterococcus is a type of bacteria that can cause infections, and can spread directly to people after they touch surfaces that are contaminated. *VRE in Healthcare Settings*, Centers for Disease Control and Prevention, https://www.cdc.gov/hai/organisms/vre/vre.html.

124.    All measurements from the Type A occurrences are required to be summarized in USIBWC's monthly self-monitoring report. NPDES Permit at E-34, Attachment E, VII.B.4.

125.    On November 29, 2016, about 200,000 gallons of untreated sewage were spilled at Goat Canyon. According to the Spill Report filed by the USIBWC, no samples were collected and none of the parameters listed in Table E-10 of the Monitoring and Reporting Program were tested.  Although the USIBWC categorized this spill as a Flow Event Type B, the description and location of the spill indicate that it is, in fact Type A. The San Diego Water Board also categorizes this occurrence as a Flow Type A event. *See* Spill Report in Exhibit 5.

126.    On March 1, 2017, about 145,000 gallons of untreated sewage spilled at Goat Canyon. According to the Spill Report filed by the USIBWC, the USIBWC only tested for standard pollutants, organics and inorganics, instead of all the items required by Table E-10 of the Monitoring and Reporting Program. *See* Spill Report in Exhibit 5.

127.    On April 30, 2017, about 645,000 gallons untreated sewage spilled at Goat Canyon. According to the Spill Report filed by the USIBWC, it was a Flow Type B event and no samples were collected by USIBWC to test for any of the parameters listed in Table E-10 of the Monitoring and Reporting Program. The San Diego Water Board conducted its own monitoring on May 1, 2017—which does

COMPLAINT,
JURY TRIAL DEMAND                        - 35 -

not fulfill USIBWC's obligation under its NPDES Permit. The San Diego Water Board determined this spill was actually a Type A event; this conclusion is supported by the description and location of the spill. *See* Spill Report in Exhibit 5.

128.   On May 24, 2017, 3,800 gallons of untreated sewage were spilled at Stewart's Drain Canyon Collector. According to the Spill Report filed by the USIBWC, no samples were collected to test for any of the parameters listed in Table E-10 of the Monitoring and Reporting Program. *See* Spill Report in Exhibit 5.

129.   Each of the above events demonstrates USIBWC's failure to conduct required sampling and constitutes an individual violation of USIBWC's NPDES Permit, CWA § 402, and Cal. Water Code § 13383.

**G.     By Discharging Waste Into the Waters of the United States, Defendant's Facilities Pollute, Contaminate, and Cause Nuisance, in Violation of Its NPDES Permit**

130.   Chapter 4 of the Water Quality Control Plan for the San Diego Basin ("Basin Plan") is incorporated into Attachment G, II.1 of the NPDES Permit. This section prohibits the discharge of waste "in a manner causing, or threatening to cause, a condition of pollution, contamination or nuisance" into State waters.

131.   Section 13050(l)(1) of the California Water Code defines "pollution" as "an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects either . . . (A) [t]he waters for beneficial uses [or] (B) [f]acilities which serve these beneficial uses." Cal. Water Code § 13050(l)(1).

132.   Section § 13050(l)(2) of the California Water Code further states that pollution may include "contamination," which is defined as:

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

an impairment of the quality of the waters of the state by waste to a degree which creates a hazard to public health through poisoning or through the spread of disease…[or]any equivalent effect resulting from the disposal of waste, whether or not waters or the state are affected.

Cal. Water Code § 13050(k).

133.   Cal. Water Code § 13050 also defines "nuisance" as:
anything which meets all of the following requirements:
(1) [i]s injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property;
(2) [a]ffects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal; [and]
(3) [o]ccurs during, or as a result of, the treatment or disposal of wastes.

Cal. Water Code § 13050(m) (emphasis added).

134.   Based on the USIBWC's own 2017 and 2018 reports, over 160,000,000 gallons of wastewater containing sewage, industrial wastes, pesticides, and other contaminants bypassed the Defendant's facilities and emptied into the Tijuana River Valley, forcing beach closures and public health advisories throughout San Diego County.

135.   These exceedances have also impacted community and third party efforts to help preserve and protect the Tijuana River Valley in areas where the USIBWC has fallen short. For example, since 2010 the Action Network has observed Tijuana River Action Month (TRAM), a series of education and stewardship events held during September and October to benefit the Tijuana River Watershed. Non-profit organizations WILDCOAST and I Love a Clean San Diego organized a Tijuana River Valley Cleanup on September 30, 2017, to gather trash and other debris left behind after spills, after which WILDCOAST members and I Love a Clean San Diego employees/volunteers fell violently ill  just from walking

COMPLAINT,
JURY TRIAL DEMAND
- 37 -

in the Tijuana River Valley during the cleanup. A WILDCOAST leader returned to the same site two weeks later for an interview with reporters, became ill again, and had to seek urgent care. A subsequent sediment quality study conducted by San Diego Coastkeeper found above average fecal indicator bacteria (FIB) concentrations in sediment samples collected in Goat Canyon. Because of health and safety concerns for their members, Surfrider's San Diego Chapter has been forced to cancel future clean up events and planting service events in the Tijuana River Valley. Surfrider has resorted to reorganizing members and volunteers for beach cleanup at Border Field State Park, outside of the Tijuana River Valley, instead.

136.   If transboundary flow passes USIBWC's canyon collector system, the NPDES Permit requires the USIBWC to monitor the flow for certain parameters and pollutants, including enterococcus, fecal coliform, pesticides, surfactants, and priority pollutants. NPDES Permit at Table E-10 "Monitoring and Reporting Program." These pollutants were chosen specifically by the San Diego Water Board due to the high threat levels they pose to water recreation and other designated uses.

137.   As detailed in Table C of the NOI, USIBWC Spill Reports demonstrate the wide range of pollutants being discharged from the canyon collectors. These discharges include everything from hazardous waste to trash, industrial chemicals to heavy metals, and pesticides to solvents.

138.   For example, below is a table setting forth the USIBWC's self-reported sampling results (using the terminology as-reported by USIBWC) of the wastewater flowing through the canyon collectors in 2017 (Flow Type A):

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

| Date | Location | Pollutants Detected |
|---|---|---|
| 10/19/2017 | Canyon del Sol Collector at International Boundary | BOD, DO, Turb, TDS, pH, Total N&P, Coliform/Entero, Chlor Pesticides, metals, cyanide, MBA's, BNA's & Phenolic Compds, Acrylonitrile, Acrolein, VOC's, 2, 3, 7, 8 TCDD's, asbestos |
| 10/7/2017 | Canyon del Sol Collector at International Boundary | BOD, DO, Turb, TDS, pH, Total N&P, Coliform/Entero, Chlor Pesticides, metals, cyanide, MBA's, BNA's & Phenolic Compds, Acrylonitrile, Acrolein, VOC's, 2, 3, 7, 8 TCDD's, asbestos |
| 6/27/2017 | Canyon del Sol Collector | BOD, DO, Turb, TDS, pH, Total N&P, Coliform/Entero, Chlor Pesticides, metals, cyanide, MBA's, BNA's & Phenolic Compds, Acrylonitrile, Acrolein, VOC's, 2, 3, 7, 8 TCDD's, asbestos |
| 5/21/2017 | Stewarts Canyon Collector | BOD, DO, Turb, TDS, pH, Total N&P, Coliform/Entero, Chlor Pesticides, metals, cyanide, MBA's, BNA's & Phenolic Compds, Acrylonitrile, Acrolein, VOC's, 2, 3, 7, 8 TCDD's, asbestos |
| 4/30/2017 | Goat Canyon at International Border | By Regional Board 5/1/17: E.Coli, Coliform |
| 4/24/2017 | Stewarts Canyon | BOD, DO, Turb, TDS, |

COMPLAINT,
JURY TRIAL DEMAND

- 39 -

McDermott Will & Emery LLP
ATTORNEYS AT LAW
IRVINE

| | | Collector | pH, Total N&P, Coliform/Entero, Chlor Pesticides, metals, cyanide, MBA's, BNA's & Phenolic Compds, Acrylonitrile, Acrolein, VOC's, 2, 3, 7, 8 TCDD's, asbestos |
| 3/1/2017 | | Stewarts Canyon Collector | Standard Pollutants, Organics and Inorganics |

139. Furthermore, on March 21, 2017, the SBIWTP violated "chronic toxicity weekly discharge limits" by almost double the effluent standard through discharge of ammonia. *See* Exhibit 4, Exhibit 8.

140. The USIBWC reported in its January 2018 monthly report to the San Diego Water Board that seven out of eight shore stations located in the U.S. were out of compliance with various Ocean Plan water contact standards. Levels of total coliforms, fecal coliforms, and enterococcus exceeded applicable standards at several stations in January. The report noted certain visual observations as well: "A sewage-like odor at stations S5, S6 and S11, a detergent odor at station S5, and water flowing from a drain at stations S0, S2 and S3. These observations were made on one or more days during the month of January." The report also noted that:

Historical analyses of the Ocean Plan compliances rates for the [SBOO] shoreline monitoring stations . . . with the results of satellite imagery data, suggest that outflows from the Tijuana River… as well as surface runoff during or after rain events (storms), are likely . . . the cause of impacted water quality along the shore and in near shore recreational waters in the South Bay region.

*See* Exhibit 4.

141. Similar results were noted in the February 2018 report with five out of eight shore stations out of compliance with various Ocean Plan water contact

McDermott Will & Emery LLP
Attorneys At Law
Irvine

standards. A Flow Type A event also was noted on February 27, 2018 at Goat Canyon Pump Station resulting in an overflow of 54,000 gallons. In both March 2018 and April 2018, one out of eight shore stations were out of compliance, and in May 2018 <u>all</u> eight shore stations were out of compliance. *See* Exhibits 4 and 12.

142.   Exposure to the pollutants, solid wastes, and hazardous wastes contained in the foregoing and other discharges present a grave threat to human health, and constitute contamination in the form of chemical poisons and fecal pathogens such as e. coli.

143.   Table D of the NOI describes the dangerous plethora of human health effects that stem from exposure to the pollutants USIBWC is discharging from the canyon collectors. Some of these effects include, but are not limited to, uncontrollable muscle movements (Aldrin), burns in mouth and throat (ammonia), disruption of blood production (benzene), kidney damage (cadmium), permanent brain damage (mercury), gastrointestinal damage (phenol), and vision and hearing loss (toluene).

144.   Further, many of the contaminants USIBWC is discharging to the Tijuana River Valley have a slow rate of decay and accumulate in the environment. Even after the initial wastewater discharge subsides, subsequent disruption of the sediment can re-release pollutants, hazardous wastes, and solid wastes into the environment and increase the long-term chance of contamination.

145.   Surfrider members in San Diego County have fallen ill from such pollutants and wastes.  Upon reaching the Pacific Ocean, beachgoers, fishermen and women, and other beach and ocean users, are subjected to direct exposure with the pollutants via dermal contact, ingestion, inhalation, or otherwise; and indirect

COMPLAINT,
JURY TRIAL DEMAND                          - 41 -

contact, by consuming exposed fish. Bacteria levels are high and exposure to these pollutants in the Tijuana River Valley constitute a substantial endangerment to human health. San Diegans are advised to avoid beach waves for 72 hours after it rains anywhere in San Diego County due to contamination from runoff, according to the *San Diego Union Tribune*.  Further, swimming at a beach in the South Bay after it rains or when there's a sewage spill can present serious health hazards according to San Diego water-quality officials.  Dave Gibson, Executive Officer of the San Diego County Regional Water Quality Control Board told the *San Diego Union Tribune*:

> You're very likely to get any one of the gastrointestinal, ear and sinus infections, but you can also be exposed to pathogens… that can make you very sick and kill you . . .  I would say it's an order of magnitude greater risk in Imperial Beach than in La Jolla following a storm event.

Joshua Emerson Smith, *Tijuana pollution contaminates South Bay beaches at astounding rate.* (Apr. 27, 2017, 5:00 AM), http://www.sandiegouniontribune.com/news/environment/sd-me-beach-closures-20170427-story.html# (also provided as Exhibit 9).

146.   According to an analysis of beach-closure data from the past decade, portions of Imperial Beach shoreline have been off-limits to swimmers and beachgoers for more than a third of each year on average, with a total of nearly 1,600 official beach-closure days in the preceding decade (compared to more northern county beach cities like La Jolla, Del Mar and Encinitas, which had fewer than a dozen days' worth of beach closures during the same January 1, 2006 to April 21, 2017 time period).  *Id.* According to locals interviewed by the San Diego Union Tribune, the pollution has depressed property values and driven away tourism in a city that is dependent on tourism revenue and ties much of its

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

economic welfare to proximity to the oceanfront.

147.   As detailed above, the pollutants being discharged are injurious to human health and the recorded beach closures present only a small picture of the impacts to the greater San Diego community.  These and other injuries are a direct result of the USIBWC's failure to properly treat and dispose of wastewaters.

## H.   Defendant's Goat Canyon Pump Station Failures Violate Its NPDES Permit

148.   Under Section III.A of the NPDES Permit, the discharge of waste from Facilities to locations other than Discharge Point No. 001, the South Bay Ocean Outfall, is prohibited. NPDES Permit at 1, 4 (referencing Table 2).

149.   Under Section VI.A.1 of the NPDES Permit, the USIBWC must comply with all Standard Provisions of the NPDES Permit included by reference and contained in Attachment D to the Permit. The standard provisions require permit compliance, and proper operation and maintenance of all facilities and systems used to achieve compliance with the requirements of the Permit. NPDES Permit at D-1, Attachment D, Section I.D.

150.   A "Facilities Spill Event" is:
[a] discharge of treated or untreated wastewater or other material to the environment that occurs from the Discharger's [USIBWC's] Facilities including, but not limited to, the entire wastewater conveyance, storage, treatment, and disposal system (wastewater system) that is owned and operated by the Discharger. The wastewater system *includes all devices and system components used such as pipes, pump stations, force mains*, Junction Box 1, Junction Box 2, the five canyon collector systems, the treatment works, [South Bay Land Outfall] SBLO, and [South Bay Ocean Outfall] SBOO.

NPDES Permit at 15, Section VI.C.2.a.i.a (emphasis added).

151.   At all relevant times, USIBWC owned and operated the collection

McDermott Will & Emery LLP
Attorneys At Law
Irvine

station and associated facilities at Goat Canyon including the Goat Canyon pump station, and operated the SBIWTP subject to the NPDES Permit issued by the San Diego Water Board.

152.   On February 27, 2018, approximately 54,000 gallons of untreated sewage spilled at the Goat Canyon pump station and into the Tijuana River. In a Spill Report signed March 6, 2018, the USIBWC states the cause of the spill was a "temporary power glitch" that placed the Programmable Logic Control ("PLC") in standby mode, resulting in the loss of level control for the pump station. With the pumps disabled, the lift station wet-well overflowed, causing a discharge of untreated sewage. The USIBWC Spill Report indicated that the spill flow destination was the "Tijuana River Channel." *See* Exhibit 12.

153.   This flow of discharge resulted in waste from the Goat Canyon Spill pump reaching the Tijuana River, Estuary, and the Pacific Ocean. The corresponding USIBWC report acknowledged the impact of the spill by listing the Tijuana River as an impacted surface water. *See* Exhibit 12.

154.   According to the March 6, 2018 Spill Report, as self-reported by USIBWC, no samples were collected to test for any parameters, none of the spill was recovered, and no cleanup was completed. The spill volume reported is based solely on the duration of the pump failure—30 minutes—and the estimated flow rate necessary for the pump to prevent the flood—1,800 gallons per minute. The actual extent of the spill was not directly measured. *See* Exhibit 12.

155.   The Facility Spill Event on February 27, 2018 occurred at the Goat Canyon Pump Station, an area separate and distinct from the authorized discharge point at the SBOO. *See* Exhibit 12. Therefore, the discharge violates the Discharge

COMPLAINT,
JURY TRIAL DEMAND                          - 44 -

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

Prohibition of the NPDES Permit. NPDES Permit at 4, III.A.

156.   USIBWC is responsible for the proper maintenance and operation of Facilities covered by the NPDES Permit, and it has failed to meet this responsibility as described in the permit. NPDES Permit at D-1, Section I.D, drawing from the minimum legal requirements found in 40 C.F.R. 122.41(e).

157.   This Facility Spill Event at the Goat Canyon pump station was preventable through proper maintenance, testing and system updating. USIBWC could have ensured the PLC system does not revert to standby mode during temporary power glitches.

158.   Discharge of a pollutant without a NPDES permit, or in violation of a NPDES permit is a violation of the Clean Water Act §402. 33 USC § 1311(a).

159.   Discharge of waste from a Facility Spill Event to surface waters of the United States is a violation of CWA § 301 and Cal. Water Code § 13376.

160.   The effects of this February 27, 2018 Facilities Spill Event include the pollution of surface waters of the United States. Discharges of waste from the Facility Spill Event resulted in untreated discharge from the Facility reaching the Tijuana River, Estuary, and Pacific Ocean. In addition to NPDES Permit violations, the USIBWC violated CWA § 301 and Cal. Water Code § 13376 by releasing untreated discharge and pollutants into these waterways.

## I.   <u>Defendant's Receiving Water Limit Exceedances Violate Its NPDES Permit</u>

161.   The NPDES Permit establishes the USIBWC's receiving water limitations which are based on water quality objectives contained in the Basin Plan and Ocean Plan, and states "the discharge of waste shall not cause or contribute to

COMPLAINT,
JURY TRIAL DEMAND

- 45 -

McDermott Will & Emery LLP
Attorneys at Law
Irvine

violation of these limitations in the Pacific Ocean." NPDES Permit at 11, V.A.1.

162.   Compliance with the receiving water limitations "shall be determined from samples collected at stations representative of the area within the waste field where initial dilution is completed." NPDES Permit at 11, V.A.1.

163.   The NPDES Permit lays out several specific standards for maintaining the bacterial objectives throughout the water column, within a zone bounded by the shoreline and a distance of three nautical miles from the shoreline, including all kelp beds. NPDES Permit at 11, V.A.1.

164.   Based on the geometric mean of the five most recent samples from each site (at the time of the NPDES Permit authorization), the NPDES Permit states the 30-day Geometric Mean cannot exceed the following standards: "a) Total coliform density shall not exceed 1,000 per 100 mL; b) Fecal coliform density shall not exceed 200 per 100 mL; and c) Enterococcus density shall not exceed 35 per 100 mL." NPDES Permit at 11, V.A.1.

165.   The NPDES Permit provides the following Single Sample Maximum standards:

a) Total coliform density shall not exceed 10,000 per 100 mL;
b) Fecal coliform density shall not exceed 400 per 100 mL;
c) Enterococcus density shall not exceed 104 per 100 mL; and
d) Total coliform density shall not exceed 1,000 per 100 mL when the fecal coliform/total coliform ratio exceeds 0.1.

NPDES Permit at 11, V.A.1.

166.   Under NPDES Permit Attachment E, "Receiving Water Monitoring Requirements," the USIBWC is required to conduct shoreline water quality monitoring at designated monitoring stations in the Pacific Ocean on a weekly basis. NPDES Permit at E-15, Attachment E, IV.A..

COMPLAINT,
JURY TRIAL DEMAND                    - 46 -

McDermott Will & Emery LLP
ATTORNEYS AT LAW
IRVINE

167.    Under NPDES Permit Attachment E, the USIBWC must submit Interim and Biennial Receiving Water Monitoring Reports to the San Diego Water Board. The Interim Receiving Water Monitoring Reports must be submitted every other (even numbered) year, and cover one year of monitoring data at a time (e.g., separate reports for calendar years 2016, 2018, and 2020). Biennial Receiving Water reports must provide a more thorough discussion, evaluation (e.g., detailed statistical analyses), and interpretation than the Interim Receiving Water Monitoring Reports, must cover two years of receiving water monitoring (e.g., biennial reports for calendar years 2016-2017, 2018-2019, and 2020-2021), and must be submitted the opposite years as the Interim Receiving Water Monitoring Reports. NPDES Permit at E-26, Attachment E, IV.E.

168.    On June 27, 2017, a spill at Canyon del Sol with an estimated spill volume of 5,500,000 gallons caused or contributed to an exceedance of the single sample maximum standard for enterococcus at receiving water monitoring station, S-5 located at the Tijuana River Slough. *See* Spill Report in Exhibit 5; *see* Monitoring Results in Exhibit 4; *see* Lab Report in Exhibit 6. (also available at https://www.waterboards.ca.gov/sandiego/water_issues/programs/tijuana_river_vall ey_strategy/docs/2017_spill_rpt/2017_6_27_spill_canon_del_sol_june.pdf).

169.    During the months of January 2015, February 2015, March 2015, May 2015, June 2015, July 2015, August 2015, October 2015, November 2015, December 2015, January 2016, February 2016, March 2015, May 2016, June 2016, November 2016, March 2017, April 2017, May 2017, June 2017, and October 2017, the USIBWC self-reported exceedances of receiving water limitations for bacteria. *See* Exhibit 10, South Bay Ocean Outfall Annual Receiving Waters

COMPLAINT,
JURY TRIAL DEMAND

- 47 -

McDermott Will & Emery LLP
Attorneys At Law
Irvine

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

Monitoring & Assessment Report 2015 at 32; *see* Exhibit 11, Biennial Receiving Waters Monitoring and Assessment Report for the Point Loma and South Bay Ocean Outfalls 2016-2017 at 43; *see* monitoring results in Exhibit 4.

170.    Each of the exceedances of receiving water limitations are separate violations of USIBWC's NPDES Permit and Clean Water Act § 402.

## J.    Even Limited Sampling of Defendant's Significant Effluents Demonstrate Health and Safety Violations of Defendant's NPDES Permit

171.    Under section IV.A of the NPDES Permit, USIBWC must meet Effluent Limitations and Performance Goals at the SBOO. NPDES Permit at 4, 5.

172.    Section 301(b) of the CWA and implementing U.S. EPA permit regulations at 40 C.F.R. 122.44(a)(1) require that permits include conditions meeting applicable technology-based requirements at a minimum, and any more stringent effluent limitations necessary to meet applicable water quality standards. Regulations promulgated in 40 C.F.R. 125.3 require technology-based effluent limitations to be placed in NPDES permits. *See also* NPDES Permit at F-17.

173.    The Federal Water Pollution Control Act Amendments of 1972 (PL 92-500) established the minimum performance requirements attainable through the application of secondary treatment as defined in 40 C.F.R.. §304(d)(1). Based on this statutory requirement, U.S. EPA developed secondary treatment regulations, which are specified in 40 C.F.R. § 133 and apply to all wastewater treatment plants. These technology-based regulations identify the minimum level of effluent quality attainable by secondary treatment in terms of Biochemical Oxygen Demand (5-day) ($BOD_5$), Total Suspended Solids (TSS), and pH.

McDermott Will & Emery LLP
Attorneys At Law
Irvine

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

174.   Because the Ocean Plan[2] is applicable, in its entirety, to point source discharges to the ocean, the discharge of wastewater at the SBOO is also covered. Table 2 of the Ocean Plan establishes technology-based effluent limitations for publicly-owned treatment works (POTW) and industrial discharges for which Effluent Limitation Guidelines have not been established pursuant to CWA §§ 301, 302, or 306. USIBWC's NPDES Permit itself also established Water Quality-Based Effluent Limitations (WQBELs). *See* NPDES Permit, Fact Sheets F-18 and F-19. Because SBIWTP is a federally-owned treatment works that serves the same functions as a POTW, numeric effluent limitations were established based on Table 2 of the Ocean Plan.

175.   Accordingly, any discharge authorized by the NPDES Permit must meet minimum federal technology-based requirements based on Secondary Treatment Standards at 40 C.F.R. § 133, technology-based requirements contained in Table 2 of the Ocean Plan, and WQBELs of the NPDES Permit.

176.   Permit section IV.A.1, Final Effluent Limitations – Discharge Point No. 001, requires that a) USIBWC "maintain compliance with the [NPDES Permit Table 4] effluent limitations at Discharge Point No. 001, with compliance measured at Monitoring Location EFF-001 as described in the Monitoring and Reporting Program [Attachment E]"; and b) "average monthly percent removal of Carbonaceous Biochemical Oxygen Demand, 5-Day value measured at 20°C (CBOD$_5$)[3] and Total Suspended Solids (TSS)[4] shall not be less than 85 percent."

---

[2] *See supra* paragraph 86.
[3] The NPDES Permit limits USIBWC to an average CBOD$_5$ monthly effluent of 25 mg/L and an average weekly CBOD$_5$ effluent of 40 mg/L, corresponding to 5,213 and 8,340 lbs/day of CBOD$_5$, respectively. No instantaneous minimum or
...(cont'd)

COMPLAINT,
JURY TRIAL DEMAND                               - 49 -

McDermott Will & Emery LLP
ATTORNEYS AT LAW
IRVINE

177.   The permit mandates Effluent Limitations for $CBOD_5$; TSS; oil and grease; settleable solids; turbidity; pH; total recoverable mercury; total recoverable zinc; chronic toxicity; acute toxicity; total recoverable thallium; tributyltin; benzidine; the sum of chlordane-alpha, chlordane-gamma, chlordene-alpha, chlordene-gamma, nonachlor-alpha, nonachlor-gamma, and oxychlordane (chlordane); chlorodibromomethane or dibromochloromethane; the sum of 4,4'DDT, 2,4'DDT, 4,4'DDE, 2,4'DDE, 4,4'DDD, and 2,4'DDD  (DDT); heptachlor; epoxide; hexachlorobenzene; polychlorinated biphenyls (PCBs); the sum of the concentrations of chlorinated dibenzodioxins (2,3,7,8-CDDs) and chlorinated dibenzofurans (2,3,7,8-CDFs) multiplied by their respective toxicity factors (TCDD equivalents); and toxaphene.

178.   Permit section IV.A.2, Performance Goals Parameters —— Discharge Point No. 001, mandates that the parameters listed in Table 5[5] of the permit "be

_____

(cont'd)
maximum values were established.

[4] The NPDES Permit limits USIBWC to an average monthly TSS effluent of 30 mg/L and an average weekly TSS effluent of 45 mg/L, corresponding to 6,255 and 9,383 lbs/day of TSS, respectively. No instantaneous minimum or maximum values were established.

[5] "*Based on ocean plan objectives for protection of marine aquatic life,*" total recoverable units of arsenic, cadmium, chromium, copper, lead, nickel, selenium, silver, and cyanide; total chlorine residual; ammonia (expressed as nitrogen); non-chlorinated phenolic compounds; chlorinated phenolics; endosulfan; endrin; hexachlorocyclohexane (HCH); and radioactivity.

"*Based on ocean plan objectives for protection of human health,*" levels of the identified *carcinogens*: acrylonitrile; aldrin; benzene; beryllium; bis(2-chloroethyl) ether; bis(2-ethlyhexyl) phthalate; carbon tetrachloride; chloroform; 1,4-dichlorobenzene; 3,3'-dichlorobenzidine; 1,2-dichloroethane; 1,1-dichloroethlyene; dichlorobromomethane; dichloromethane or methylene chloride; 1,3-dichloropropene or 1,3-dichloropropylene; dieldrin; 2,4-dinitrotoluene; 1,2-diphenylhydrazine; halomethanes; heptachlor; hexachlorobutadiene; hexachloroethane; isophorone; N-nitrosodimethylamine; N-nitrosodi-N-propylamine; N-nitrosodiphenylamine; polynuclear aromatic hydrocarbons (PAH);
...(cont'd)

COMPLAINT,
JURY TRIAL DEMAND

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

monitored at Monitoring Location EFF-001" by USIBWC. Discharge Point No. 001 (EFF-01) is defined as:

> [d]ownstream of any in-plant return flows at the Facility where representative samples of effluent treated at the [SBIWTP] Facility can be collected, prior to commingling with other discharges contributing to the South Bay Ocean Outfall (SBOO). Latitude: 32° 32' 37.68"N; Longitude:[]117° 03' 54.83" W.

NPDES Permit at E-4, Table E-1.

179.   As discussed above in Section I, USIBWC has a long history of exceeding influent and effluent limitations, and related quality issues, predating this and other NPDES permits and orders. This includes influent and effluent limitation exceedances of arsenic, mercury, $CBOD_5$, TSS, acute toxicity, and TCDD. Even after an SBIWTP upgrade to secondary treatment became operational in November 2010, "due to various operational problems the facility was unable to consistently achieve substantial compliance with secondary treatment effluent limitations until mid-2012." *See* Compliance Summary, NPDES Permit at F-12, F-13.

180.   Under the current NPDES Permit, numerous other violations have occurred. As discussed above, monitoring requirements have not been consistently followed, and USIBWC has been issued numerous violations for deficient reporting since issuance of the NPDES Permit.

_____

(cont'd)
1,1,2,2-tetrachloroethane; tetrachloroethylene or tetrachloroethene; trichloroethylene or trichloroethene; 1,1,2-trichloroethane; 2,4,6-trichlorophenol; and vinyl chloride.
"*Based on ocean plan objectives for protection of human health*," levels of the identified *noncarcinogens*: acrolein; antimony; bis(2-chloroethoxy); methane; bis(2-chloroisopropyl); ether; chlorobenzene; chromium (III); di-n-butyl phthalate; dichlorobenzenes1; diethyl phthalate; dimethyl phthalate; 4,6-dinitro-2-methylphenol; 2,4-dinitrophenol; ethylbenzene; fluoranthene; hexachlorocyclopentadiene; nitrobenzene; toluene; and 1,1,1-trichloroethane.

COMPLAINT,
JURY TRIAL DEMAND

- 51 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

McDermott Will & Emery LLP
Attorneys At Law
Irvine

181.   The reporting that has been done, of samples that have been recovered and tested, and are publicly available, are deeply concerning.

182.   For example, available data for October 2015 (from the five sampling dates provided) indicates a maximum chronic toxicity of 100 TUc on October 6, 2015, exceeding the maximum daily chronic toxicity effluent limitation of 95.6 TUc. This is a violation of the NPDES Permit. Violation ID 999922. This violation of the NPDES Permit is 1.04 times the maximum daily chronic toxicity value allowed under the NPDES Permit. USIBWC self-reported a Corrective Action of "Notified Mexico of toxic load." *See* Exhibit 4, Exhibit 8.

183.   For example, available data for March 2017 (from five sampling dates provided) indicates a maximum chronic toxicity of 200 TUc on March 21, 2017, exceeding the maximum daily chronic toxicity effluent limitation of 95.6 TUc. This is a violation of the NPDES Permit. Violation ID 1023975. This violation of the NPDES Permit is 2.09 times the maximum daily chronic toxicity value allowed under the NPDES Permit. USIBWC self-reported a Corrective Action of "Nitrogenous population was reestablished and effluent ammonia is within nontoxic levels." *See* Exhibit 4, Exhibit 8.

184.   For example, available data for April 2017 indicates an average monthly flow of 25.96 million gallons per day (MGD), exceeding the average monthly effluent limitation of 25 MGD. This is a violation of the NPDES Permit. Violation ID 1025473. This violation of the NPDES Permit translates to about 30,000,000 gallons of flow exceeding the allowed amount under the NPDES Permit. USIBWC self-reported a Corrective Action of "Work with Mexico to determine how PB-1 can take more flow." *See* Exhibit 4, Exhibit 8.

COMPLAINT,
JURY TRIAL DEMAND

- 52 -

185.   For example, available data for August 2017 indicates an average monthly flow of 25.28 million gallons per day (MGD), exceeding the average monthly effluent limitation of 25 MGD. This is a violation of the NPDES Permit. Violation ID 1032767. This violation of the NPDES Permit translates to about 8,680,000 gallons of flow exceeding the allowed amount under the NPDES Permit. Despite this being an effluent limitation violation, USIBWC self-reported a Corrective Action of "Communicate with CESPT to prevent future occurrences." *See* Exhibit 4, Exhibit 8.

186.   For example, available data for September 2017 indicates an average monthly flow of 25.02 million gallons per day (MGD), exceeding the average monthly effluent limitation of 25 MGD. This is a violation of the NPDES Permit. Violation ID 1033905. This violation of the NPDES Permit translates to about 600,000 gallons of flow exceeding the allowed amount under the NPDES Permit. Despite this being an effluent violation, USIBWC self-reported a Corrective Action of "Continue to work with Mexico to control influent flows." *See* Exhibit 4, Exhibit 8.

187.   Such repeated and significant exceedances prove that the USIBWC has failed and continues to fail to develop and/or implement Best Management Practices, to prevent both the exposure of pollutants to storm water and the discharges of polluted storm water from USIBWC facilities. This violates the Effluent Limitations in Table 4 of the NPDES Permit. NPDES Permit at 5.

188.   As summarized in Table C of the NOI and documented in USIBWC's Spill Reports to the San Diego Water Board, from self-reporting sampling data attached to USIBWC Monthly reports available on CIWQS unless otherwise

COMPLAINT,
JURY TRIAL DEMAND

- 53 -

noted, (*see*, e.g., USIBWC, Monthly Spill Report for May 2017, (dated June 30, 2017)), canyon collector discharges contain pollutants, hazardous wastes, and/or solid wastes including, inter alia, garbage and refuse; discarded solid, semisolid, and liquid materials from commercial, industrial, residential, and agricultural operations and activities; metals, including, but not limited to, arsenic, beryllium, cadmium, chromium, copper, lead, nickel, and zinc; pesticides, including aldrin, dichlorodiphenyltrichloroethane (DDT), dieldrin, heptachlor, and lindane; solvents, including benzene, trichloroethene, and toluene; and many others.

189.    Exposure to the pollutants, solid wastes, and hazardous wastes contained in such discharges present a grave threat to human health. Table D of the NOI describes the human health effects of exposure to a selection of the materials that USIBWC has reported are present in discharges from the canyon collectors.

190.    Human occupants, business employees, and recreational users of the Tijuana River Valley are exposed to the aforementioned pollutants and contaminants through dermal absorption, inhalation of volatilized pollutants, inhalation of dust with adsorbed pollutants, and unintended ingestion of polluted or contaminated organisms. Even U.S. Border Patrol agents working in the Tijuana River Valley are frequently exposed to these materials by walking through or wading in waters in the drainages, and have reported chemical burns, respiratory irritation, and other injuries requiring medical care. One of the U.S. Border Patrol contractors conducting testing of the area even fell ill after his first day on site.

191.    As discussed above, these exceedances have also impacted community and third party efforts to help preserve and protect the Tijuana River Valley in areas where the USIBWC has fallen short.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

COMPLAINT,
JURY TRIAL DEMAND

- 54 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

McDermott Will & Emery LLP
Attorneys At Law
Irvine

192.    Once these pollutants, solids, and hazardous wastes reach the Tijuana River, Estuary, and ocean, they continue to present an exposure risk to anyone that comes into direct or indirect contact. Exposure to these and other hazardous wastes and pollutants in the Tijuana River Valley and canyon collectors constitute an endangerment to human health.

193.    These exceedances also degrade natural habitat and detrimentally impact threatened and endangered species. The Tijuana River Valley is a diverse natural habitat. The Tijuana Estuary provides critical wildlife habitat and acts as a natural water filter—especially crucial when fewer than 10% of California's coastal marshes and wetlands remain. However, the sewage and industrial waste flooding the Estuary makes the area toxic and unsafe for humans, wildlife, and vegetation; kills organisms; and impairs the natural filtration capabilities of the Estuary.

194.    These exceedances also expose land, marine, and estuarine flora and fauna to dangers inherent dangers in such waste, e.g., suppression of immune system response, alteration of defense mechanisms, and depression of essential biological activity. These individually or in combination increase the susceptibility of wildlife to disease and infections. Wildlife in the Tijuana River Valley cannot escape exposure to the above-discussed pollutants and wastes.

195.    The NPDES Permit notes that "[USIBWC]… has not indicated that any plans exist to make additional upgrades or alterations to its system." NPDES Permit at F-13.

196.    Discharges associated with USIBWC's facilities occur without adequate measures to prevent water exposure to pollutant sources, and without

secondary containment mechanisms or other adequate treatment measures to prevent polluted discharge from the USIBWC facilities.

197.   The pollutants associated with USIBWC facilities have and continue to disperse throughout the Tijuana River Valley, accumulating at the storm water discharge points.

198.   The continued and repeated exceedances of USIBWC's NPDES Permit demonstrate the inadequacy of the SBIWTP for treating water and failure of USIBWC to address such failures.

199.   Each of the exceedances described above constitutes a separate violation of USIBWC's NPDES Permit, CWA § 402, and Cal. Water Code § 13383.

## VII.   CAUSES OF ACTION

### A.   First Cause of Action: Discharges in Violation of NPDES Permit No. CA0108928, in Violation of the Clean Water Act 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

200.   Surfrider incorporates by reference the allegations of Paragraphs 1 through 199 as if fully set forth herein.

201.   Plaintiff Surfrider is a "person" within the meaning of the Clean Water Act and is authorized to pursue a citizen enforcement action on its own behalf.

202.   Defendant USIBWC is a "person" within the meaning of the Clean Water Act.

203.   Defendant USIBWC owns, operates, maintains, and therefore exerts control over the USIBWC canyon collectors.

204.   The canyon collectors are "point sources" within the meaning of the

McDermott Will & Emery LLP
Attorneys At Law
Irvine

COMPLAINT,
JURY TRIAL DEMAND

- 56 -

Clean Water Act.

205.    Defendant USIBWC, by its acts and omissions, have been and will continue to add pollutants from the canyon collectors to navigable waters.  The pollutants include, but are not limited to: trash, sediment, sewage, enterococcus, fecal coliforms, methylene blue active substances, chromium, copper, zinc, arsenic, cadmium, lead, aldrin, DDT, heptachlor, toluene, and phenol.  The navigable waters that receive USIBWC's canyon collector discharges include, but are not limited to, the new water immediately downstream of the canyon collectors, the Tijuana River, the Tijuana River Estuary, and the Pacific Ocean.

206.    Defendant USIBWC has violated and continues to violate the Clean Water Act, 33 U.S.C. § 1311(a) and 1342, which prohibits the discharge of pollutants in violation of a NPDES permit. NPDES Permit No. CA0108928 (California Waste Discharge Requirement Order R9-2014-0009 as amended by Order R9-2014-0094) prohibits discharges from any facility subject to the permit except at the South Bay Ocean Outfall.  Defendant is also in violation of the permit's requirement for compliance with the basin plan. NPDES Permit at G-1. Defendant USIBWC's discharges of wastewater and other pollutants from the canyon collectors to waters of the United States are ongoing and continuous violations of that discharge prohibition.

207.    Defendant USIBWC violated and continues to violate the Clean Water Act and NPDES permit requirements through its failure to meet its monitoring, reporting, maintenance, and response obligations of its NPDES Permit.

208.    Defendant USIBWC violated and continues to violate the Clean Water Act and NPDES permit receiving water limitations based on water quality

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

objectives contained in the Basin Plan and Ocean Plan. Defendant USIBWC's discharges of wastewater and other pollutants adversely impact human health and safety and adversely affect the environment.

209.   Defendant USIBWC's violations of the Clean Water Act and NPDES Permit began at least as far back as 2015 and continue up to the present. These violations will continue until the Defendant complies or is ordered to comply with its NPDES Permit by eliminating discharges from the USIBWC canyon collectors, including the Goat Canyon Pump Station failures, 33 U.S.C. §§ 1311(a) and 1342.

210.   Each day that Defendant USIBWC discharges or has discharged from each canyon collector in violation of its NPDES Permit is a separate and distinct violation of the Clean Water Act, 33 U.S.C. § 1311(a).

211.   By committing the acts and omissions alleged above, Defendant USIBWC is subject to an assessment of civil penalties for each violation pursuant to the Clean Water Act, 33 U.S.C. §§ 1319 and 1365.

212.   This action for injunctive relief is authorized by the Clean Water Act, 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff, for which harm they have no plain, speedy, or adequate remedy at law.

213.   Wherefore, Plaintiff prays for relief as set forth below.

**B.**      **Second Cause of Action: Discharges Without a NPDES Permit, in Violation of the Clean Water Act, 33 U.S.C. § 1311(a)**

214.   Surfrider incorporates by reference the allegations of Paragraphs 1 through 213 as if fully set forth herein.

COMPLAINT,
JURY TRIAL DEMAND

- 58 -

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

215.   Plaintiff is a "person" within the meaning of the Clean Water Act and is authorized to pursue a citizen enforcement action on its own behalf.

216.   Defendant is a "person" within the meaning of the Clean Water Act.

217.   Defendant owns, operates, maintains, and therefore exerts control over the USIBWC Flood Control Structure.

218.   The Flood Control Structure is a "point source" within the meaning of the Clean Water Act.

219.   Defendant, by its acts and omissions, has and without intervention, will continue to add pollutants from the Flood Control Structure to waters of the United States. The pollutants include, but are not limited to: trash, sediment, chemicals, heavy metals, and sewage containing coliform, *e. coli* and enterococcus, and other contaminants. The navigable waters that receive USIBWC's Flood Control Structure discharges include, but are not limited to, the new water immediately downstream of the Structure, the Tijuana River, the Tijuana River Estuary, and the Pacific Ocean.

220.   Defendant has not obtained a NPDES permit for discharges from the USIBWC Flood Control Structure into waters of the United States.

221.   Defendant has violated and continues to violate the Clean Water Act, 33 U.S.C. §§ 1311(a) and 1342.  Prohibited from discharging pollutants without a NPDES permit, USIBWC is in violation by allowing continuous discharges of wastewater and other pollutants from the USIBWC Flood Control Structure to waters of the United States.

222.   Defendant's violations of the Clean Water Act have been ongoing and continuous since the USIBWC Flood Control Structure was first constructed in

McDermott Will & Emery LLP
Attorneys At Law
Irvine

1978.  These violations will continue until Defendant obtains and complies with a NPDES permit for these discharges, 33 U.S.C. §§ 1311(a) and 1342.

223.   Each day that Defendant has discharged and continues to discharge from the USIBWC Flood Control Structure without a NPDES permit is a separate and distinct violation of the CWA, 33 U.S.C. § 1311 (a).

224.   This action for injunctive relief is authorized by the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above will irreparably harm the Plaintiff, for which harm they have no plan, speedy, or adequate remedy at law.

225.   Wherefore, Plaintiff prays for relief as set forth below.

## VIII. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Surfrider respectfully requests that this court:

A.      Declare Defendant has violated and is in continued violation of, the Clean Water Act and NPDES Permit No. CA0108928.

B.      Order permanent injunction on the Defendant from discharging pollutants into any waters of the United States except in compliance with its NPDES Permit No. CA0108928.

C.      Declare Defendant has violated and is in continued violation of the Clean Water Act, 33 U.S.C. § 1311, for its failure to obtain a required NPDES permit for the Flood Control Structure.

D.      Order the Defendant to obtain a NPDES permit before discharging pollutants from the Flood Control Structure into waters of the United States, so as to be in compliance with the Clean Water Act.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

E.      Order applicable civil monetary penalties for each violation of the Clean Water Act at up to $53,484 per day, per violation, extending back for each violation that occurred during the five (5) years prior to filing date for the notice of intent to file suit letter. *See* 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4, Table 2.

F.      Award Plaintiff Surfrider its reasonable costs of enforcing these actions, including attorney, witness, expert, and consultant fees, as authorized by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

G.      Grant such further relief as the Court may deem just and appropriate.

## IX.  <u>JURY DEMAND</u>

Surfrider hereby demands a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure for all issues raised in this Complaint.

Dated: July 17, 2018

Respectfully submitted,

**McDERMOTT WILL & EMERY LLP**
Margaret H. Warner
Daniel R. Foster
Jiaxiao Zhang

By: _s/ Daniel R. Foster_
     Attorney for Plaintiff
     E-mail: dfoster@mwe.com

**SURFRIDER FOUNDATION**

By: _s/ Angela T. Howe_
     Attorney for Plaintiff
     Angela T. Howe
     E-mail: ahowe@surfrider.org

*Attorneys for Plaintiff*
*SURFRIDER FOUNDATION*

DM_US 153729522-12.099749.0929

COMPLAINT,
JURY TRIAL DEMAND

- 61 -

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

# EXHIBIT TABLE OF CONTENTS

**Page**

Exhibit 1
Notice of Intent to Sue Letter Sent on May 15, 2017 — 64

Exhibit 2
NPDES Permit for the South Bay International Water Treatment Plant — 106

Exhibit 3
Spill Prevention and Response Plan — 271

Exhibit 4
NPDES Monitoring Result Letters for the SBIWTP — 374
 October 2015 — 375
 March 2017 — 379
 April 2017 — 383
 June 2017 — 386
 August 2017 — 389
 September — 392
 January 2018 — 395
 February 2018 — 398
 March 2018 — 402
 April 2018 — 405

Exhibit 5
Canyon Collector Transboundary Spill Reports — 408
 November 29, 2016 Spill at Goat Canyon — 409
 March 1, 2017 Spill at Goat Canyon — 410
 April 30, 2017 Spill at Goat Canyon — 411
 May 24, 2017 Spill at Stewarts Canyon — 412
 June 27, 2017 Spill at Del Sol Canyon — 413

Exhibit 6
Lab Report for 6/27/17 Spill at Canyon Del Sol — 414

Exhibit 7
Facility At-A-Glance Report: Looking at Chronic
Toxicity Exceedances on 3/21/17 — 427

McDermott Will & Emery LLP
Attorneys At Law
Irvine

COMPLAINT,
JURY TRIAL DEMAND

Exhibit 8
ESMR (SBIWTP Facility) At-A-Glance: Monthly Reports          444
          October 2015                                      445
          March 2017                                        495
          April 2017                                        521
          August 2017                                       547
          September 2017                                    573

Exhibit 9
San Diego Tribune 4/27/17 Article                           599

Exhibit 10
South Bay Ocean Outfall Annual Receiving Waters Monitoring &
Assessment Report 2015                                      606

Exhibit 11
2016–2017 Biennial Receiving Waters Report                  919

Exhibit 12
Transboundary Spill Report for February 27, 2018
Spill at Goat Canyon Pump Station                           1344

McDermott Will & Emery LLP
Attorneys At Law
Irvine

COMPLAINT,
JURY TRIAL DEMAND